UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
BENEFITVISION INC.,

              Plaintiff,                              **MEMORANDUM & ORDER**
                                                                    09 CV 0473 (DRH)

              vs.

GENTIVA HEALTH SERVICES, INC.
doing business as Gentiva Health Services
(USA) Inc., GENTIVA SERVICES OF
NEW YORK, INC., GENTIVA HEALTH
SERVICES, INC., GENTIVA HEALTH
SERVICES, IPA INC., GENTIVA HEALTH
SERVICES INC., a Registered Foreign Delaware
Corporation, Doing Business in New York as
Gentiva Health Services Inc.

                        Defendants.
----------------------------------------------------------X
**APPEARANCES:**

Attorneys for Plaintiff
236 West 26th Street
Suite 303
New York, New York 10001
By:    Manuel Moses, Esq.

**COULTER & WALSH**[1]
Attorneys for Defendants
675 Third Avenue
Suite 1805
New York, New York 10017
By:    John V. Coulter, Esq.

---

[1] On August 23, 2010, Magistrate Judge A. Kathleen Tomlinson "So Ordered" a Notice of Consent to Change Attorney, which substituted Defendants' current attorneys, of the law firm Coulter & Walsh, in the place of Attorneys Philip J. Walsh and Concepcion A. Montoya, of Hinshaw & Culbertson, 780 Third Avenue, Fourth Floor, New York, New York 10017, who were listed as Defendants' attorneys' of record at the time the present motion was filed.

**HURLEY, Senior District Judge:**

Plaintiff Benefitvision, Inc. ("BVI" or "Plaintiff") commenced this action against defendants Gentiva Health Services, Inc., doing business as Gentiva Health Services (USA) Inc., Gentiva Services of New York, Inc., Gentiva Health Services, IPA Inc., and Gentiva Health Services Inc. (collectively, "Gentiva" or the "Defendants") to recover damages based upon Defendants' alleged breach of contract. Presently before the court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, Defendants' motion is denied.

## BACKGROUND

The following facts are taken from the pleadings, the parties' Local Civil Rule 56.1 Statements and the papers submitted by the parties in connection with the motion.[2]

### *The Parties*

BVI is a benefits communication and enrollment company incorporated under Illinois law that provides services to human resource departments of large and mid-sized companies. BVI's

---

[2] The Court notes, as an initial matter, that Plaintiff's 56.1 Statement does not comply with either Local Civil Rule 56.1 or my Individual Practice Rules. *See* Local Rule 56.1(b) (requiring a party opposing a motion for summary judgment to submit "***a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party and, if necessary, additional paragraphs containing*** a separate, short and concise statement of ***additional*** material facts as to which it is contended that there exists a genuine issue to be tried.") (emphasis in the original); Indiv. Practice Rule 3(k) (requiring that "the papers opposing a motion for summary judgment shall reprint the movant's numbered paragraphs before providing a responsive paragraph."). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001). Accordingly, the Court will consider not only the uncontested facts set forth in Defendants' 56.1 Statement, but will "consider other facts contained in the record." *See Di Rienzo v. Metro. Transp. Auth.*, 237 Fed. Appx. 642, 646 (2d Cir. June 20, 2007); *see also In re Parikh*, 2009 WL 2383032, at *2 (July 30, 2009) (collecting cases).

"services include providing benefit counselors that give benefit orientations[ ] to employees of client organizations helping them make informed decisions about their employee benefits," and then "recording those decisions" and "processing that data." (Am. Compl. ¶ 5.) Gentiva is a "provider of comprehensive home healthcare and related services" (Defs.' Mem. at 2) and is a Delaware corporation with its principal place of business in New York.

*Letter of Intent*

On or about June 2006, BVI and Gentiva began to negotiate the terms of a contract whereby BVI would provide benefit orientation and enrollment services to Gentiva employees. The parties documented their pre-contract negotiations in a Letter of Intent ("LOI") dated July 13, 2006. According to the LOI, the parties agreed to "negotiate in good faith" toward completing a contractual agreement that would allow "BVI [to] become the benefit orientation/benefit enrollment source of all full-time benefit-eligible employees." (Decl. of Philip J. Walsh, dated Feb. 5, 2010 ("Walsh Decl."), Ex. 3 at 1.) BVI assured Gentiva that "[a]ll enrollers will have insurance licenses, as needed." (*Id.* at 2.)

*Broker of Record Letters*

Subsequently, Gentiva sent three letters addressed to Ron Kleiman, President of BVI ("Kleiman"). The first letter is dated September 14, 2006; the remaining two letters are undated. (*See* Walsh Decl., Ex. 4.) The first letter states:

> Dear Ron,
>
> We are pleased to inform Benefit Vision, Inc. that you are our Broker of Record for the Universal Life Plan, effective September 1, 2006, on all enrollments effective January 1, 2007 going forward until further notice.

(*Id.*) The following two letters are identical, except that they substitute "Accident Insurance Plan" and "Critical Illness Plan" in the place of "Universal Life Plan." (*Id.*)

*Master Service Agreement*

On November 6, 2006, the two parties executed a Master Service Agreement (the "Agreement") whereby "BVI agree[d] to provide GENTIVA with employees of BVI who [would] provide services on request by GENTIVA." (Walsh Decl., Ex. 5 at 1.) Pursuant to the Agreement, each specific work assignment for BVI would be memorialized in a separate Statement of Work ("SOW") setting forth details of the specific services BVI would provide to Gentiva. (*Id.* at 1.) Defendants have submitted an SOW, signed by the parties on November 28 and 30, 2006, which defines the scope of BVI's work for a two-year term as including the following tasks: "sending enrollment packages to new hires," "develop[ing] a computer presentation that will record/verify the employee's data, explain the employee's total benefit program, explain and record enrollment decisions for each benefit area, provide a summary review of all decisions," "send[ing] employee enrollment information to all elected carriers for processing," "send[ing] Gentiva a payroll deduction once a week," and processing employees' qualified life status changes. (*Id.* at 6.)

The Agreement provided that "[n]o fees of any type or nature other than the rate or fixed project rate set forth on each applicable SOW shall be due to BVI except as otherwise specifically stated herein." (*Id.* at 1.)[3] The Agreement further states that BVI will be compensated for its provision of its services as follows:

---

[3] The SOW provided that "Benefitvision will be compensated through employee payroll deduction by selected insurance carrier." (Walsh Decl., Ex. 5 at 7.)

4

> BVI will be permitted to include a new optional benefit (or benefits) as part of the Gentiva Health Services benefit package that has been approved prior by Gentiva. To the extent employees enroll for the new coverage or coverages, BVI will receive the applicable commission from the applicable Insurance companies. Any new products to be added will be mutually agreed upon by BVI and Gentiva Health Services. Gentiva Health Services will help facilitate this process by making the benefit(s) available on a payroll deduction basis. Recognizing that BVI's compensation comes from the payment of premiums over time, Gentiva Health Services agrees to continue payroll deduction services for the optional benefit or benefits enrolled for at least three (3) years from the end of this contract, as long as at least 200 employees are having premium deducted.

(*Id.* at 1-2.) The "new option benefit (or benefits)" referred to in this provision of the Agreement included life and accident insurance policies issued by TransAmerica Life Insurance Company ("TransAmerica") and critical illness insurance policies issued by AIG.[4] (*See* Defs.' 56.1 ¶ 8.)

The Agreement provided that it would be effective "from the Effective Date [November 6, 2006] until December 31, 2008, unless cancelled by either party within 90 days notice after the initial termination date of this agreement." (*Id.* at 1.) The term "initial termination date" is not defined elsewhere in the Agreement. The Agreement further states:

> On ninety (90) days' notice to the other Party, either GENTIVA or BVI may terminate this Agreement and any SOWs hereto for convenience, provided, however, that either Party may terminate any one or more SOWs without terminating this Agreement. Notwithstanding termination of one or more SOWs, payment for services rendered by BVI to and including said date of termination shall be due and payable by GENTIVA to BVI.

(*Id.* at 3.)

Finally, the Agreement provides that it "shall be governed by the law of the state of New

---

[4] The Court notes that TransAmerica and AIG are not parties to this lawsuit or the Agreement.

York as to all matters, including, but not limited to, matters of validity, construction, effect and performance, except that no doctrine or choice of law rules shall be used to apply any law other than that of New York." (*Id.* at 4.)

***Termination of the Relationship Between Gentiva and BVI***

By letter dated August 16, 2007, Gentiva informed Kleiman "that Gentiva Health Services is terminating its relationship with Benefit Vision effective December 31, 2007." (Walsh Decl., Ex. 6.)

***The Amended Complaint***

BVI commenced this action on February 5, 2009. In its Amended Complaint,[5] BVI alleges that "Plaintiff had enrolled about 5000 TransAmerica Life or Accident policies, or AIG Critical Illness policies, from among the employees of the Plaintiff, for which he was due commissions earned to the date of the terminated, and based on payroll deductions to take place for the next three years under the contract." (Am. Compl. ¶ 11.) BVI further alleges that Gentiva breached the Agreement "when it failed to maintain the payroll deductions for the three years following the end of the contract." (*Id.* ¶ 12.) BVI contends that:

> After having completed substantial work in enrolling and advising thousands of Defendant[s'] employees into their respective benefit plans, and having enrolled about 5,000 commission earning insurance policies, Defendants stopped the payroll deductions resulting in a loss of expected earnings to the Defendants of approximately $800,000. Those earning[s] would have been payable as commissions from the insurance companies had the payroll deductions continued.

(*Id.* ¶ 13.)

---

[5] The Amended Complaint differs from the initial Complaint only in that Gentiva Health Services Inc. was added as a defendant.

*BVI's Subsequent Motion to Amend the Amended Complaint*

On January 8, 2010, BVI filed a motion to amend the Amended Complaint to: (1) revise the *ad damnum* clause and (2) "amplify the word 'commission'" as it is used in the Amended Complaint. (*See* Judge Tomlinson Mem. & Order, dated Sept. 27, 2010, Docket No. 71 at 2.) With respect to Plaintiff's first request, Judge Tomlinson permitted BVI "to increase the *ad damnum* clause 'to reflect the revised amount of damages,'" but denied Plaintiff's motion to add a clause that would "further state Plaintiff's position . . . whether Defendant was permitted to terminate the [Agreement] prior to March 31, 2009." (*Id.* at 9.)

Judge Tomlinson also denied Plaintiff's request to "amend the Complaint to amplify the word 'commission' . . . 'to accurately reflect the proper relationship of the commissions paid over to BVI from Ronald Kleiman [BVI's] President and sole owner.'" (*Id.* at 14.) According to Plaintiff, this amendment was "necessary to rebut Defendants' argument on summary judgment 'that the plaintiff is not a licensed broker and cannot be due commissions – as damages[,]" when, in fact "[a]ll commissions concerning this cause of action were paid to Ronald Kleiman who then pays all those monies over to [BVI] – fully and directly." (*Id.*) Judge Tomlinson found that, by moving to amend more than seven months after learning of Defendants' position with respect to the alleged commissions owed and three months after the expiration of the deadline to amend the pleadings, Plaintiff had failed "show[ ] that it diligently sought to comply with the schedule order," and did not show the necessary good cause to modify that deadline. (*Id.* at 17-18.) Moreover, the Court noted that it was "particularly skeptical of motions made in the context that exists here – where Plaintiff waited to raise the proposed amendment until after Defendant sought leave to move for summary judgment on the same grounds (as well as others)." (*Id.* at 18

7

(internal quotation marks and citations omitted).) Finding that "Defendants would be unduly prejudiced if Plaintiff were granted leave to amend to amplify the word 'commission,'" Judge Tomlinson denied Plaintiff's motion. (*Id.* at 20.)[6]

## DISCUSSION

### I. *Applicable Law and Legal Standards*

#### A. *Summary Judgment*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002,

---

[6] Neither party appealed Judge Tomlinson's September 27, 2010 decision.

1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court, in considering a summary judgment motion, must also be "mindful [ ] of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.' " *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

### B. *Choice of Law*

Plaintiff argues that Georgia law governs the present dispute – not New York law, as Defendants assert. Plaintiff contends that Georgia law is applicable because the "Group Master

9

Policy" document for TransAmerica's "Universal Life Insurance" policy lists "Georgia" as the "Governing Jurisdiction." (*See* Pl.'s Opp'n at 5; Aff. of Ronald Kleiman, dated Mar. 3, 2010 ("Kleiman Aff.") ¶ 38, Ex. C.) The Court does not find that this document is relevant to the determination of the correct law to apply to this dispute over the interpretation of the Agreement.

Ordinarily, in a diversity case, "a federal court would apply the law of the forum in which the court is located." *Johnson & Johnson Fin. Corp. v. BSR Realty L.P.*, 1996 WL 546284, at *2 (E.D.N.Y. Sept. 19, 1996) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). "In applying the law of the forum, the court must also apply that state's choice of law rules." *Id.* (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)); *see also Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005) ("As jurisdiction is grounded in diversity, we apply the forum state's choice-of-law rules."). Accordingly, the Court should apply New York's choice of law rules.

New York law is clear that "absent fraud or violation of public policy, contractual selection of governing law is generally determinative so long as the State selected has sufficient contacts with the transaction." *Hawes Office Sys., Inc. v. Wang Labs., Inc.*, 537 F. Supp. 939, 942 (E.D.N.Y. 1982); *see also Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 592 (2d Cir. 1996) (same).

The Agreement explicitly provides that it "shall be governed by the law of the state of New York as to all matters." (Walsh Decl., Ex. 5 at 1.) Moreover, Defendants' principal place of business is Melville, New York. (Am. Compl. ¶¶ 2, 3.) Accordingly, New York law will apply to the present dispute. *See Johnson & Johnson Fin. Corp.*, 1996 WL 546284 at *3.

## II. Defendants' Motion is Denied

### A. Relevant New York Insurance Law Provisions and Applicable Case Law

New York Insurance Law provides as follows:

> Unless licensed as an insurance agent, insurance broker or insurance consultant with respect to the relevant kinds of insurance, no person, firm, association or corporation shall receive any money, fee, commission or thing of value for examining, appraising, reviewing or evaluating any insurance policy, annuity or pension contract, plan or program or shall make recommendations or give advice with regard to any of the above.

N.Y. Ins. Law § 2102(b)(3). The law further states that: "No person shall accept any commission, service fee, brokerage or other valuable consideration for selling, soliciting or negotiating insurance in this state if that person is required to be licensed under this article and is not so licensed." N.Y. Ins. Law § 2102(e)(1). Moreover, "[r]enewal or other deferred commissions may be paid to a person or other entity for selling, soliciting or negotiating insurance in this state if the person or other entity was required to be licensed under this article at the time of the sale, solicitation or negotiation and was so licensed at that time." N.Y. Ins. Law § 2102(e)(2).

A plaintiff may not sue to recover unpaid commissions for his brokerage services if he was not licensed as a broker pursuant to New York law at the time he provided those brokerage services. *Gutfreund v. DeMian*, 227 A.D.2d 234, 234 (1st Dep't 1996) ("The failure of plaintiff to be licensed as an insurance broker when he allegedly entered into the oral agreement sued upon rendered the agreement between plaintiff and the [ ] defendants illegal and unenforceable, and barred plaintiff from collecting insurance commissions under Insurance Law § 2012(b)(3)."); *accord Escobio v. Am. Int'l Grp., Inc.*, 262 F.3d 1207, 1212-13 (11th Cir. 2001) ("Pursuant to

11

New York law, a person or entity who did not have a required insurance license at the time he/it engaged in brokerage activities cannot, as a matter of law, recover compensation associated with unlicensed brokerage activities.").

### B.    The Parties' Contentions

Defendants contend that it is entitled to summary judgment because "BVI is barred and has no standing to recover insurance commissions because it is not licensed as an insurance broker in the State of New York." (Defs.' Mem. at 7.)  Defendants assert that although BVI is not licensed as an insurance broker under New York law, BVI "acted as Gentiva's insurance broker to procure critical illness, [and] universal life and accident insurance plans." (*Id.* at 7-8.)  As such, Defendants assert that New York law prohibits BVI from receiving commissions for its brokerage services, such as "when it appraised, reviewed, solicited, evaluated, made recommendations or gave advice to Gentiva employees concerning various voluntary insurance plans as the Broker of Record for Gentiva." (*Id.* at 9.)  Defendants argue that BVI's unlicensed status "renders any agreement entered into [to pay it commissions] as illegal and unenforceable, and bars such entity from collecting insurance commissions." (*Id.*)

BVI does not appear to contest that it, as an entity, is not licensed as an insurance broker in New York.[7]  Instead, Plaintiff contends that "BVI only performed administrative and computer support services and did not require a license to perform those duties." (Pl.'s Opp'n at 7.)  According to BVI, "[o]nly properly licensed agents conducted enrollments of Gentiva employees

---

[7] In response to Defendants interrogatories asking BVI to list the states in which it was licensed as an insurance agency or insurance broker for the period between 2005 and 2007, BVI responded: "BVI, as a corporation, has an insurance license in IL, PA, OK, and CA." (Walsh Decl., Ex. 7 at 7-8.)  BVI also responded that "Ronald Kleiman, President of BVI, is licensed in all 50 states plus Washington, D.C." (*Id.*)

. . ., and those agents were salaried – not commissioned – and only Ron Kleiman the sole owner of BVI was the agent of record to receive commissions on all policies sold for this group policy." (*Id.* at 7.) In his affidavit, Kleiman states as follows:

> For the sales of the life and accident insurance policies and critical illness policies sold through Gentiva to Gentiva employees; ***I was the only person paid commissions by TransAmerica Occidental Life Insurance Company and American General Assurance Company***. . . .
>
> As the agent of record, and in my individual capacity, I exclusively received all commissions earned for work performed under this contract. At no time did BVI receive any commission. . . .
>
> BVI's income was solely derived from money I allocated to BVI and such income was recorded properly on my personal taxes. This money was *never paid out to BVI – as commissions. It was allocated and attributed to BVI as Outside Services as can be seen on my Schedule C.*

(Klein Aff. at ¶¶ 13, 17, 18 (emphases in the original); *see also* Aff. of Susan L. Witz, CPA MST, dated Mar. 2, 2010 ("Witz Aff.") (stating that "Kleiman, the licensed agent, recorded the commission income on his Schedule C, and annually nomineed the earnings to BVI").

### C. *The Agreement is Not Illegal and Unenforceable as a Matter of Law*

As noted above, in providing for BVI's compensation, the Agreement states that "[t]o the extent employees enroll for the new coverage or coverages, BVI will receive the applicable commission *from the applicable Insurance company*." (Walsh Decl., Ex. 5 at 1 (emphasis added).) This clear and unambiguous language provides that any commissions due based upon BVI's enrollment of Gentiva employees in "new optional benefit (or benefits) as part of the Gentive Health Services benefit package" would be paid out by the insurance company issuing those benefits (namely, TransAmerica or AIG) – not Gentiva. The Agreement sets forth

Gentiva's "recogni[tion]" that a commission would only be due to the extent that its employees paid their insurance premiums, and so Gentiva agreed to facilitate their employees' premium payments via payroll deductions. Gentiva further agreed that such payroll deductions would continue "for the optional benefit or benefits enrolled for at least three (3) years from the end of this contract, as long as at least 200 employees are having premiums deducted." (*Id.* at 1-2.)

BVI alleges that Gentiva breached the Agreement by failing to live up to its obligation to continue payroll deductions – not that Gentiva itself did not pay BVI (or Kleiman) commissions. (Am. Compl. ¶¶ 13-15.) Gentiva argues, however, that because the Agreement states that "BVI will receive the applicable commissions," and because BVI is not a licensed insurance broker or agent under New York law, and because New York law prohibits the payment of commissions to an unlicensed insurance broker, the Agreement is illegal and unenforceable as a matter of law.

Despite the Agreement's characterization of the commissions as being paid to BVI, the record evidence shows that the insurance companies – the entities actually paying the commissions – were not parties to, and were not bound by, the Agreement. In other words, just because the Agreement (drafted by Gentiva) states that "BVI will receive the applicable commissions" from the non-party insurance companies does not automatically make it so. The record contains credible evidence that – as common sense would suggest – BVI came to a separate agreement with TransAmerica and AIG as to the exact manner in which those insurance companies would pay out any commissions due, to wit, that commissions for the sale of their life and accident and critical illness insurance policies were paid by those insurance companies to Kleiman – not to BVI as an entity. (*See* Kleiman Aff. ¶¶ 13, 17, 18, 21, 22, 24, 25; *see also* Aff. of John Palmer Resor, dated Feb. 28, 2010 ("Resor Aff.") ¶¶ 9–11.) For example, Timothy W.

14

Key, Director of Commissions & Third Party Administrator Operations for Transamerica, states "[c]ommissions earned for services provided to [TransAmerica] by [BVI] were paid to its President, Ronald Kleiman." (Aff. of Timothy W. Key, dated Jan. 5, 2010 ("Key Aff.") ¶ 4.)

Gentiva argues that statements made in the expert report prepared by Hayden Burrus, BVI's retained expert (the "Expert Report"), "confirm[ that] BVI, and not Kleiman, seeks commissions." (*See* Reply Mem. at 5.) Specifically, Gentiva points to the following statements made in the Expert Report: "As a consulting actuary, I have been retained by BenefitVision Inc. to calculate the commissions that would have been payable *from the Gentiva Program to BenefitVision* . . . Based on my expert opinion and analysis *the commissions due BenefitVision* resulting from insurance products that would have been sold . . . equal $1,780,983." (Walsh Decl., Ex. 9 ¶¶ 7, 12 (emphases added).) The Court does not find these statements to be binding admissions that commissions were paid directly to BVI. Mr. Burrus was retained and conducted his expert analysis for the purposes of calculating commissions lost after Gentiva ceased employee premium payroll deductions – not to opine as to whether the insurance companies made their commission payments directly to BVI or to Kleiman. (*See id.* ¶ 7.)

Gentiva further argues that statements in Kleiman's affidavit that he – not BVI – received the commissions should be "discredit[ed]" as "contradict[ing BVI's] prior discovery responses." (Reply Mem. at 5.) The prior discovery response to which Gentiva refers is contained in BVI's Response to Defendants' First Request for Admissions, which pre-dates Kleiman's affidavit by almost one year, and reads as follows:

> BVI received commission payments, either directly or indirectly, from insurance companies including, but not limited to, TransAmerica and American General, for enrollments of employees

15

for optional insurance benefits. **Admitted as true.**

(Walsh Decl., Ex. 8 at ¶ 8 (emphasis added).) In his subsequent affidavit, Kleiman states: "When I stated in the notice to admit that BVI received commissions indirectly, what is stated in this affidavit is what I originally defined as indirectly," meaning that "BVI would get revenue from my agency relationship with TransAmerica [ ] and [AIG], which was properly transferred in the ordinary course of business, for their administrative work, and not paid as a commission." ((Kleiman Aff. ¶¶ 43, 24.)

The Court declines to discredit Kleiman's subsequent statements in his affidavit as contradictory to prior discovery responses. The cases cited by Gentiva set forth the well-established principle that "plaintiff cannot defeat a motion for summary judgment by responding with affidavits recanting [ ] earlier [deposition] testimony." *See Margo v. Weiss*, 213 F.3d 55, 61-62 (2d Cir. 2000) (plaintiff could not "recant" earlier testimony by submitting contradictory affidavits, untimely errata sheets, and "supplemental answers" to interrogatories). This, however, is not the case of a "party who has been examined at length on deposition [attempting to] raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony." *See Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969). Gentiva's Requests for Admissions were served early in discovery – approximately six months before Kleiman was deposed. The challenged statements in Kleiman's affidavits that attempt to explain and clarify BVI's response to a Request for Admission do not pose the same concern to the Court as a belated affidavit that directly contradicts the affiant's prior sworn deposition testimony given after extensive questioning and cross-examination.

Finally, the Court does not agree with Gentiva's assertion that the Broker of Record

16

letters leave "no doubt that BVI acted as broker." (Defs.' Mem. at 10.) The three letters referred to, which are addressed to Kleiman, state that Gentiva was "pleased to inform Benefit Vision, Inc. that *you* are our Broker of Record for the Universal Life Plan," Accident Insurance Plan, and Critical Illness Plan, respectively. (*See* Walsh Decl., Ex. 4 (emphasis added).) This language is reasonably susceptible to an interpretation that "you" refers to Kleiman – not BVI. Moreover, the documentation submitted by BVI further persuades the Court that a question of fact exists as to whether BVI (as an entity) or Kleiman was the broker of record for the insurance plans at issue. (*See* Kleiman Aff., Ex. A (listing Kleiman as TransAmerica's "Broker of Record"); Ex. B (listing Kleiman as TransAmerica's "Licensed Agent").)

## *CONCLUSION*

The Court recognizes that BVI may have been remiss in not always taking proper care to specifically delineate that its claimed lost compensation is derived from commissions it claims are paid to Kleiman and then "nomineed" to BVI. (*See, e.g.* Am. Compl. ¶¶ 8, 11.) Furthermore, the Court takes no position as to whether the arrangement cited complies with New York Insurance Law. However, based on the record evidence before it, and mindful that there still remains discovery to be completed, the Court does not find, as a matter of law, that the Agreement is illegal and unenforceable. Accordingly, Defendants' motion for summary judgment is DENIED.

**SO ORDERED.**

Dated: Central Islip, New York
       March 14, 2011                                   /s/
                                                 Denis R. Hurley
                                                 Unites States District Judge