UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
BENEFITVISION INC.,

                              Plaintiff,                       **MEMORANDUM & ORDER**
                                                            09-CV-0473 (DRH) (AKT)

        - against -

GENTIVA HEALTH SERVICES, INC. D/B/A
GENTIVA HEALTH SERVICES (USA) INC.,
GENTIVA SERVICES OF NEW YORK, INC.
GENTIVA HEALTH SERVICES, IPA, INC.,

                              Defendants.
------------------------------------------------------------X
**A P P E A R A N C E S :**

**For the Plaintiff:**
**MANUEL MOSES, ESQ.**
236 West 26th Street, Suite 303
New York, New York 10001
By:  Manuel B. Moses, Esq.

**For Defendant:**
**COULTER & WALSH**
675 Third Avenue, Suite 1805
New York, New York 10017
By:  Philip J. Walsh, Esq.

**HURLEY, Senior District Judge:**

       Plaintiff Benefitvision Inc. ("BVI" or "Plaintiff") commenced this action against

defendants Gentiva Health Services, Inc., doing business as Gentiva Health Services (USA) Inc.

("Gentiva USA"), Gentiva Services of New York, Inc. ("Gentiva NY"), Gentiva Health Services,

IPA Inc. ("Gentiva IPA"), and Gentiva Health Services Inc. ("Gentiva Inc."), (collectively,

"Gentiva" or the "Defendants"), to recover damages based upon Defendants' alleged breach of

contract.  Presently before the court is Gentiva's second motion for summary judgment pursuant

to Federal Rule of Civil Procedure ("Rule") 56 and BVI's cross-motion for summary judgment

pursuant to Rule 56.  For the reasons set forth below, the Defendants' motion is granted in part and denied in part, and the Plaintiff's motion is denied.

## BACKGROUND

The material facts, drawn from the Amended Complaint and the parties' Local Civil Rule 56.1 Statements, are undisputed unless otherwise noted.[1]

### The Parties

BVI is a benefits communication and enrollment company incorporated under Illinois law that provides services to human resource departments of large and mid-sized companies. (Am. Compl. ¶¶ 1, 5.)  BVI's "services include providing benefit counselors that give benefit orientations[ ] to employees of client organizations helping them make informed decisions about their employee benefits," and then "recording those decisions" and "processing that data."  (*Id.* ¶ 5.)  Gentiva "is a provider of comprehensive home healthcare and related services" (Defs.' Mem. at 3) and is a Delaware corporation with its principal place of business in New York (*Id.* ¶ 3).

---

[1] On February 26, 2013, the Court issued an Order directing Plaintiff to file a revised Local Rule 56.1 statement because the document Plaintiff initially filed, entitled "Plaintiff's Statement of Facts Seeking to Move for Summary Judgment Per Civil Rule 56.1," (Docket No. 125), did not conform to the requirements of Local Rule 56.1.  The Court additionally directed Defendants to file a responsive statement to Plaintiff's revised statement that complies with Local Rule 56.1(b) and Individual Practice Rule 3(k).  The Court notes, however, that while Plaintiff thereafter filed a revised Local Rule 56.1 statement, entitled "Plaintiff's Amended Statement of Facts for Summary Judgment Per Civil Rule 56.1," (Docket No. 139), that complies with the requirements of Local Rule 56.1, the statement filed by Defendants in response to Plaintiff's revised Local Rule 56.1 statement, (Docket No. 140), does not comply with Local Rule 56.1's requirements.  Instead, Defendants' response appears to be identical to the response filed by Defendants to Plaintiff's initial Local Rule 56.1 statement, (Docket No. 131-1), and consists of blanket denials that are not supported by citation to admissible evidence, as is required by Local Rule 56.1.  Accordingly, the statements contained in Plaintiff's revised Local Rule 56.1 statement will be deemed admitted to the extent they are supported by admissible evidence from the record.  *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003).  Notwithstanding same, the Court also considers the statements in Defendants' Local Rule 56.1 statement filed in support of Defendants' motion, as well as Plaintiff's statement filed in response to Defendants' statement, as those statements comply with Local Rule 56.1's requirements.

***Letter of Agreement***

"On or about June 2006, BVI and Gentiva began to negotiate the possibility of entering into [an agreement] whereby BVI would provide benefit orientation and enrollment services to Gentiva employees."  (Defs.' R. 56.1 Stmt. ¶ 1.)  The parties' negotiations were documented in a Letter of Agreement ("LOA"), dated July 13, 2006.  (*Id.*)  "According to the LOI [sic], the parties agreed to 'negotiate in good faith' and BVI assured Gentiva that 'all enrollers [would] have insurance licenses, as needed.' "  (*Id.* ¶ 2.)

The LOA provided:

> The term of this agreement will be from September 1, 2006 to December 31, 2008, renewable automatically thereafter unless cancelled by either party with 90 days notice after the termination date of this agreement.  In support of this program, GENTIVA HEALTH SERVICES agrees to continue payroll deduction services for the optional benefit or benefits enrolled for at least three years from the end of this contract . . . .

(Pl.'s R. 56.1 Stmt. ¶ 1.)

On August 9, 2006, Gentiva USA's Vice-President, Brian Silva ("Silva"), signed Gentiva's revised LOA dated July 13, 2006, which had been renamed a Letter of Intent ("LOI"). (*Id.* ¶ 2.)  The LOI provided that its term would "commence on or about September 1, 2006 in order to begin planning" and that "[u]pon agreement of definitive contractual agreement, [the] LOI [would] terminate and the new contract be executed."  (*Id.*)

***Broker of Record***

BVI was designated by Gentiva as Gentiva's Broker of Record, as of September 1, 2006, for all enrollments of certain optional insurance plans from January 1, 2007 until otherwise notified.  (Defs.' R. 56.1 Stmt. ¶ 3.)  Plaintiff contends that the "designation was in the form of a

3

letter drafted by Gentiva."  (Pl.'s R. 56.1 Counterstmt. ¶ 3.)  According to Plaintiff, Gentiva had

no authority to designate a Broker of Record, but, rather, "[t]he [B]roker of [R]ecord was

designated by Transamerica Insurance Company."[2]  (*Id.*)  Gentiva states that Ronald Kleiman

("Kleiman") "admit[ted] that BVI was Broker of Record and that he never disclosed to Gentiva

that he personally was acting as Broker of Record."  (Defs.' R. 56.1 Stmt. ¶ 24.)  Kleiman was

the sole owner and President of BVI.  (Pl.'s R. 56.1 Counterstmt. ¶ 6.)

***Master Service Agreement***

In November 2006, the two parties executed a Master Service Agreement ("MSA")

which provided that it would "be effective from the Effective Date until December 31, 2008,

unless canceled by either party with 90 days notice after the initial termination date of this

agreement."  (Pl.'s R. 56.1 Stmt. ¶ 3.)  While Gentiva asserts that the MSA provided that "[o]n

ninety (90) days' notice to the other Party, either Gentiva or BVI [could] terminate th[e]

Agreement and any [Statement of Work ("SOW")] . . . for convenience, provided, however, that

either Party [could] terminate any one or more SOW without terminating th[e] Agreement"

(Defs.' R. 56.1 Stmt. ¶ 9), BVI argues that the "scope of work detail[ed] a two year term" (Pl.'s

R. 56.1 Counterstmt. ¶ 9).[3]

BVI agreed to provide services for Gentiva employees, including "mailing insurance

packages to new hires, educating Gentiva employees about the open enrollment process,

---

[2] As noted *infra*, TransAmerica was one of the insurance companies that provided optional insurance benefits for Gentiva's employees.

[3] Although the parties do not define "Statement of Work" upon the instant motions, Gentiva asserted upon its first motion for summary judgment that each of BVI's specific work assignments were to be memorialized in a separate Statement of Work that detailed the services BVI would provide for Gentiva.  *See Benefitvision Inc. v. Gentiva Health Servs., Inc.*, 2011 WL 888280, at *1 (E.D.N.Y. March 14, 2011).

recording employee enrollment decisions and sending them to the insurers for processing and underwriting, creating payroll deduction files, handling benefit termination, and developing computer software to record employee benefit elections."  (Defs.' R. 56.1 Stmt. ¶ 5.)

To compensate BVI for its services, the MSA provided that "[t]o the extent employees enroll for the new coverage or coverages[,] BVI will receive the applicable commission from the applicable Insurance companies."  (*Id.* ¶ 6.)  The MSA further provided: "Recognizing that BVI's compensation comes from the payment of premiums over time, Gentiva . . . agrees to continue payroll deduction services for the optional benefit or benefits enrolled for at least three (3) years from the end of [the] MSA, as long as at least 200 employees are having premium [sic] deducted."  (*Id.*; Pl.'s R. 56.1 Stmt. ¶ 4.)  Kleiman testified that BVI required "at least a two year commitment" and deduction of payrolls "for at least three years after any termination of the contract" because of the "large start up costs."  (Pl.'s R. 56.1 Stmt. ¶ 5.)

"Essentially, under the MSA, in exchange for assisting Gentiva with benefit enrollment, BVI was permitted to introduce and procure new insurance products to Gentiva employees and . . . earn commissions based upon the number of insurance products sold[,] . . . includ[ing] life and accident insurance from TransAmerica Life Insurance Company and critical illness insurance from AIG."  (Defs.' R. 56.1 Stmt. ¶ 7.)  In response to Gentiva's First Set of Requests for Admissions, BVI admitted that "BVI received commission payments, either directly or indirectly, from insurance companies including, but not limited to, TransAmerica and American General, for enrollments of employees for optional insurance benefits" (*Id.* ¶ 17).  BVI contends, however, that the commissions were actually earned by Kleiman.  (Pl.'s R. 56.1 Counterstmt. ¶ 6.)

"Associated with the MSA, was a Scope of Work (SOW) agreement that was signed" in November by both parties.[4] (Pl.'s R. 56.1 Stmt. ¶ 7.)  The SOW agreement, which was executed after the MSA, did not contain a 90 day notice of termination provision, but did contain a clause providing that the engagement would be effective "for two (2) years commencing the date of signature on th[e SOW]."  (*Id.* ¶ 8.)  Further, the SOW agreement detailed a four step "Escalation Procedure" which BVI contends was not implemented by Gentiva.  (*Id.* ¶ 7.)  According to BVI, "[t]he MSA required Gentiva to take a final step and escalate any cancellation of the contract to each party's legal counsel for advance and review in an attempt to resolve dissatisfactions"; however, during an email conversation with other Gentiva employees, Gentiva employee Carol Boyer ("Boyer") stated, "I would say we followed the first 2 bullets but never escalated to Legal."  (*Id.* ¶ 10.)  In another email dated August 6, 2007 to a different Gentiva employee, Kevin Marrazzo ("Marrazzo"), Boyer stated, "Houston, I think we have a problem.  This talks about 2 years."  (*Id.* ¶ 11.)  BVI asserts that at the time of Boyer's August 6th email, "Gentiva had already signed a contract with [Workscape, Inc. ("Workscape")] to replace BVI."  (*Id.*)

***Gentiva's Relationship with Workscape***

On or about March 22, 2007, Gentiva arranged a meeting with Workscape.  (Pl.'s R. 56.1 Stmt. ¶ 13.)  According to BVI, Workscape was a competitor of BVI.  (*Id.*)  BVI states that Gentiva signed a contract with Workscape on June 29, 2007, thereby replacing BVI.  (*Id.*)  BVI further states that, under its new arrangement, Gentiva would share in the commissions from the sale of life insurance policies to its own employees.  (*Id.* ¶ 14.)  Thus, BVI asserts that

---

[4] The Court notes that the Scope of Work agreement also referred to itself as a Statement of Work.  The Court will simply refer to this document as the "SOW."

6

"Gentiva's upper management had a profit motive for terminating the MSA [with BVI and hiring Workscape, in that] Gentiva earned about four hundred thousand dollars in [shared commissions]."  (*Id.* ¶ 23.)

***Termination of the Relationship Between Gentiva and BVI***

"On August 16, 2007, Gentiva terminated its relationship with BVI, including its 'Broker of Record' status."  (Defs.' R. 56.1 Stmt. ¶ 11.)  Gentiva sent a letter which stated, "This is to inform you that Gentiva Health Services is terminating its relationship with Benefit Vision effective December 31, 2007."  (Pl.'s R. 56.1 ¶ 17.)  Thereafter, on August 27, 2007, Kleiman sent a letter to Silva protesting the termination, and stating:

> [I]n accordance with the [MSA] between our firms, signed in November, 2006, the agreement is not subject to cancellation until December 31, 2008.  The exact wording is: This Agreement shall be effective from the Effective Date until December 31, 2008, unless cancelled by either party with 90 days notice **after the initial termination date** of this agreement. (Bold added for emphasis.)

(*Id.* ¶ 18.)  Subsequently, Boyer wrote an email to Marrazzo that referred to Kleiman's protest, and stated, "HOLY S***."  (*Id.* ¶ 19.)

According to BVI, "Gentiva discontinued employee payroll deductions for all Policies sold under the MSA."  (*Id.* ¶ 6.)  BVI further states that "[o]n October 25, 2007[,] the Life Insurance Policies sold by BVI through the company Transamerica was [sic] cancelled, by a cancellation notice sent to the company Transamerica."  (*Id.* ¶ 25.)  Transamerica thereafter acknowledged Gentiva's request to discontinue the employees' payroll deductions.  (*Id.* ¶ 26.)  BVI asserts that as a result of the discontinuation of payroll deductions, "very few Gentiva employees would continue paying for their life insurance policies on their own," and the

7

discontinuation of those policies "allowed Gentiva . . . to sell new insurance policies to their employees which generated new first year commissions."  (Pl.'s R. 56.1 Stmt. ¶ 27.)

***BVI's Licenses***

In response to an interrogatory, BVI stated that during the years 2005 through 2007, "BVI, as a corporation, ha[d] . . .  insurance license[s] in [Illinois, Pennsylvania, Oklahoma and California]."  (Defs.' R. 56.1 Stmt. ¶ 13.)  BVI provided the same response when asked to identify in which states it was licensed as an insurance broker.  (*Id.* ¶ 14.)  Based upon BVI's responses to certain requests for admissions and interrogatories, Gentiva concludes that BVI "is not a licensed insurance broker in New York."  (*Id.* ¶ 19.)  According to Gentiva, "BVI's Expert Affidavit . . . also confirm[s] that even though BVI was not licensed as an insurance broker in New York, it expected to receive commissions based on insurance products sold to Gentiva employees."  (*Id.* ¶ 20.)  In addition, Gentiva asserts that BVI seeks future commissions.  (*Id.* ¶ 21.)

Furthermore, BVI's enrollers were not brokers (*id.* ¶ 15); however, BVI states that "all enrollers were properly licensed agents in the state [sic] they sold policies."  (Pl.'s R. 56.1 Counterstmt. ¶ 15.)

## DISCUSSION

### I.  *Summary Judgment Standards*

Summary judgment pursuant to Rule 56 is appropriate only where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law.  *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994).  The relevant governing

8

law in each case determines which facts are material; "[o]nly disputes over facts that might affect

the outcome of the suit under the governing law will properly preclude the entry of summary

judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable

factual issue exists when the moving party demonstrates, on the basis of the pleadings and

submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the

non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn.*

*Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

　　To defeat a summary judgment motion properly supported by affidavits, depositions, or

other documentation, the non-movant must offer similar materials setting forth specific facts that

show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002,

1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. &*

*Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477

U.S. at 252) (internal quotation marks omitted), or "some metaphysical doubt as to the material

facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (internal quotation marks

omitted), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on

"mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of*

*Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

　　The district court considering a summary judgment motion must also be "mindful . . . of

the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928

(5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the "evidentiary burdens that the

respective parties will bear at trial guide district courts in their determination of summary

9

judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the nonmovant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.' " *Id.* at 211 (citing *Matsushita*, 475 U.S. at 587).

**II.    *Gentiva's Motion for Summary Judgment is Granted in Part and Denied in Part***

Gentiva seeks summary judgment as to BVI's breach of contract and promissory estoppel claims, as well as BVI's claim for attorneys' fees and disbursements. The Court will address each of Gentiva's arguments in turn.[5]

### A.   *There is an Issue of Fact as to Whether New York Insurance Law Prevents Recovery by BVI*

New York Insurance Law defines an "insurance broker" as:

> [A]ny person, firm, association or corporation who or which for any compensation, commission or other thing of value acts or aids in any manner in soliciting, negotiating or selling, any insurance or annuity contract or in placing risks or taking out insurance, on behalf of an insured other than himself, herself or itself or on behalf of any licensed insurance broker . . . .

N.Y. Ins. Law § 2101(c). The law further provides that:

---

[5] The Court notes that Gentiva failed to move for summary judgment on BVI's claims for quasi-contractual relief and relief on the basis of unjust enrichment, and only addressed those claims for the first time in its reply brief. Accordingly, the Court will not consider those arguments and Gentiva is not entitled to summary judgment as to those claims. *See Concepcion v. United States*, 181 F. Supp. 2d 206, 231 (E.D.N.Y. 2002) ("[I]t is well settled in the Second Circuit that a party may not raise an argument for the first time in a reply brief.").

> Unless licensed as an insurance agent, insurance broker or insurance consultant with respect to the relevant kinds of insurance, no person, firm, association or corporation shall receive any money, fee, commission or thing of value for examining, appraising, reviewing or evaluating any insurance policy, annuity or pension contract, plan or program or shall make recommendations or give advice with regard to any of the above.

N.Y. Ins. Law § 2102(b)(3).

Gentiva's primary argument in support of summary judgment is that New York Insurance Law requires a party to be a licensed insurance broker in order to receive a commission, and, according to Gentiva, since BVI is not licensed as an insurance broker in New York, it cannot recover the insurance commissions (both past and future) it seeks to collect as damages. (Defs.' Mem. in Support at 8-11.) Gentiva contends that "there is no doubt that BVI[,] as Gentiva's Broker of Record, solicited Gentiva employees in enrolling and purchasing optional insurance benefits . . . from the insurers and received commissions on that insurance business." (*Id.* at 10.) Gentiva further argues that "Kleiman now admits that he never disclosed to Gentiva that BVI was not acting as Gentiva's insurance broker" despite the fact that BVI was the Broker of Record. (*Id.*) Finally, Gentiva argues that the evidence establishes that "BVI was not a licensed insurance broker in New York when it contracted with Gentiva[, nor] at the time BVI was designated as Gentiva's Broker of Record for the . . . insurance plans[, nor] when it collected commissions for th[ose] insurance plans from AIG and TransAmerica." (*Id.* at 10-11.)

In opposition, BVI argues that Gentiva's motion is frivolous because the same issue was previously argued and decided by this Court upon Gentiva's first motion for summary judgment, at which time Kleiman submitted an affidavit establishing that he and BVI's enrollers were properly licensed within the State of New York. (Pl.'s Mem. in Opp'n. at 2.) However, Gentiva

argues in reply that, contrary to BVI's assertion, "the instant motion does not take the [same] position [as on its prior motion, i.e.,] that the MSA is violative of New York law and, therefore, [is] unenforceable." (Defs.' Reply at 8.) Instead, Gentiva presently argues that there is no issue of fact that: 1) paragraph 4 of the MSA, which provides for BSA's compensation in the form of commissions, was drafted by Kleiman; 2) BVI was the Broker of Record, and not Kleiman, individually; and 3) the damages sought by BVI are, in fact, insurance commissions. (Decl. of Philip J. Walsh, dated Jan. 17, 2012 ("Walsh Decl.") at 1-7.) Thus, Gentiva argues, because it is undisputed that BVI, as an unlicensed broker in New York, is seeking damages in the form of commissions for the services it performed pursuant to the MSA, New York Insurance Law bars BVI's claims.

As a preliminary matter, the Court notes that Gentiva's arguments upon its present motion for summary judgment are, in substance, the same arguments it set forth upon its first motion for summary judgment. The only apparent difference between Gentiva's arguments upon its first motion for summary judgment and its present motion is that while Gentiva initially argued that BVI's unlicensed status rendered the MSA, which was entered into to pay BVI commissions, illegal and unenforceable, and barred BVI from collecting damages constituting unpaid insurance commissions (*see Benefitvision Inc.*, 2011 WL 888280, at *6), Gentiva's instant motion argues, without reference to the legality of the MSA, that BVI's status as an unlicensed broker prevents it from collecting damages constituting unpaid insurance commissions.

The Court does not find Gentiva's slightly reframed arguments to be any more availing. Although Gentiva argues that it is now clear that Kleiman drafted the paragraph of the MSA

which describes BVI's compensation in the form of commissions, as the Court noted upon Gentiva's first motion for summary judgment, the record also contains evidence that the commissions were actually paid to Kleiman individually, and not BVI, and that Kleiman then paid BVI for its "administrative and computer support services."  *Id.*  Thus, there is an issue of fact as to whether BVI seeks damages for unpaid commissions or for unpaid support services.

Similarly, although Gentiva argues that it is now clear that BVI was the Broker of Record, as the Court noted in its prior decision, the record nonetheless contains evidence that the insurance commissions were paid to Kleiman, individually, and not BVI, *see id.*, at *7, and that Kleiman was a licensed broker at the time he received the commissions.  *See id.*, at *6, n.7.

Notably, Gentiva has not presented any argument that Kleiman's receipt of the commissions was in any way unlawful, nor any argument that Kleiman should not have been permitted to receive the commissions when BVI was the Broker of Record rather than Kleiman. Indeed, while BVI may have been the Broker of Record, the Court notes that "[a] broker of record letter is a written statement signed by an insured advising an insurer that a particular broker or agent shall act as the insured's representative" and that "[a] broker of record letter is not a creation of statute or regulation[, but, rather,] was developed by the insurance industry as a means of conducting business transactions."  *See* Broker of Record Letters, Opinion of the Office of General Counsel of the State of New York Insurance Department (Jan. 9, 2006).  The Court is not aware of, nor has Gentiva provided, any legal support for the proposition that the Broker of Record letters (which BVI argues were drafted by Gentiva) were binding legal documents requiring commission payments to be paid only to BVI, the designated Broker of Record.

Further, the Court disagrees with BVI's argument that there is no issue of fact that the

damages sought by BVI are insurance commissions.  As discussed above, the record contains

evidence that the insurance companies paid the commissions to Kleiman, not BVI, and that BVI

seeks damages for unpaid administrative and computer support services.

Finally, the Court observes that the evidence Gentiva proffers in support of its motion

actually serves to undermine its arguments, and emphasizes the existence of triable issues of fact.

For example, Gentiva quotes the following deposition testimony of Kleiman in order to establish

that Kleiman was the draftsman of paragraph 4 of the MSA:

> Q. And the Letter of Agreement came from you, did it not?
>
> A. It did.
>
> Q. You used those words in the Letter of Agreement, did you not?
>
> A. Yes
>
> Q. So when you used those words in the Letter of Agreement, you were
> writing to tell them, telling them how you were going to be paid, isn't that
> correct?
>
> A. Yes

(Walsh Decl. at 3.)  While Gentiva argues that Kleiman's deposition testimony establishes that

paragraph 4 of the MSA was drafted by Kleiman rather than Gentiva, the Court notes that

Kleiman agreed that the words in the Letter of Agreement directed Gentiva as to how *he* was

going to get paid.  Similarly, Gentiva submits evidence of American General Assurance

Company's commission schedule, which states, "The following commissions will be paid for

business secured by Ronald Kleiman."  (Walsh Decl., Ex. L.)  Here, too, Kleiman testified that

the commissions schedule indicated how *he* was going to be paid.  (*See* Walsh Decl. at 6-7.)

Thus, Gentiva's evidence demonstrates an issue of fact as to whether Kleiman was to be the

recipient of the commissions rather than BVI.

In sum, the Court finds a triable issue as to whether the arrangement between Kleiman and BVI complies with New York Insurance Law.  Specifically, in viewing the facts most favorably to the non-movant BVI, the Court finds that issues of facts remain as to whether: 1) Kleiman, who was arguably a licensed broker in New York, rather than BVI, was the intended recipient of the commissions; and 2) whether the damages BVI seeks are for commissions rather than unpaid services.

### B.  *Gentiva is Granted Summary Judgment as to BVI's Claim Based Upon Promissory Estoppel*

Gentiva argues that BVI's claim based upon promissory estoppel must fail because BVI has failed to prove two of the three elements necessary for a claim of promissory estoppel, i.e., a clear and unambiguous promise and an unconscionable injury.  (Defs.' Mem. in Support at 14-15.)  This Court previously determined that New York law governs this action.  *See Benefitvision*, 2011 WL 888280, at *5.  Under New York law, "[a] cause of action for promissory estoppel . . . requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance." *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000) (citing *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 301 (2d Cir. 1996)).  While the Court agrees that BVI's claim based upon promissory estoppel must be dismissed, it bases its decision on separate grounds.

The Second Circuit has expressly identified two situations in which a claim for promissory estoppel may be invoked: 1) "for the enforcement of a promise in the absence of

bargained-for consideration"; or 2) "to provide relief to a party where the contract [has been] rendered unenforceable by operation of the Statute of Frauds." *Merex A.G. v. Fairchild Weston Sys., Inc.*, 29 F.3d 821, 824 (2d Cir. 1994); *see also Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44-45 (2d Cir. 1995) (reiterating that promissory estoppel is applied in two situations: as a substitute for consideration and to contravene the effect of the Statute of Frauds). However, neither of the two situations specifically enumerated by the Second Circuit is present in this case.

Furthermore, the Court notes that "[b]ecause it is a quasi-contractual claim, . . . promissory estoppel generally applies only in the absence of a valid and enforceable contract." *Kwon v. Yun*, 606 F. Supp. 2d 344, 368 (S.D.N.Y. 2009); *see also Mendez v. Bank of Am. Home Loans Servicing, LP*, 840 F. Supp. 2d 639, 654 (E.D.N.Y. 2012) (recognizing general rule that the existence of a valid, enforceable written contract bars a claim for promissory estoppel); *Unique Photo, Inc. v. Vormittag Assocs., Inc.*, 2010 WL 3924828, at *6 (E.D.N.Y. Aug. 27, 2010) ("Promissory estoppel is a narrow doctrine designed to enforce a contract in the interest of justice where some contract formation problem would otherwise prevent enforcement.") (citation and internal quotation marks omitted), report and recommendation adopted, 2010 WL 39093224 (E.D.N.Y. Sept. 29, 2010); *Spherenomics Global Contact Ctrs. v. vCustomer Corp.*, 427 F. Supp. 2d 236, 253 (E.D.N.Y. 2006) (finding that the remedy of promissory estoppel is "inapposite when there is a valid and enforceable written contract governing a particular subject matter") (citation and internal quotation marks omitted).[6]  "[A] promissory estoppel claim is duplicative

---

[6] Although some courts have noted that the Second Circuit has treated promissory estoppel claims differently from quasi-contractual and unjust enrichment claims, and has implicitly recognized that a party may

of a breach of contract claim unless the plaintiff alleges that the defendant had a duty independent from any arising out of the contract." *Underdog Trucking, LLC, Reggie Anders v. Verizon Servs. Corp.*, 2010 WL 2900048, at *6 (S.D.N.Y. July 20, 2010).  Here, neither party argues that the MSA is invalid or unenforceable, or that Gentiva owed BVI a duty independent from any duty arising from the MSA.  Thus, BVI's claim based upon promissory estoppel is dismissed.[7]

### C.  BVI's Claim for Attorneys' Fees and Disbursements is Dismissed

Defendants argue that BVI is not entitled to disbursements or attorneys' fees in this case "because the contract between the parties (i.e., MSA) is silent as to counsel fees and disbursements."  (Defs.' Mem. in Support at 15.)

Under New York's general rule governing breach of contract actions, "attorneys' fees and disbursements are incidents of litigation and the prevailing party may not collect them from the loser unless an award is authorized by agreement between the parties or by statute or court

---

simultaneously assert claims based upon promissory estoppel and breach of contract, *see, e.g.*, *DFP Mfg. Corp. v. Northrop Grumman Corp.*, 1999 WL 33458384, at *8 (E.D.N.Y. March 23, 1999) (stating that "the Second Circuit has distinguished promissory estoppel claims from unjust enrichment claims which may lie only in the absence of a valid enforceable written contract") (citing *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 157 F.3d 956 (2d Cir. 1998)), the Court finds that the Second Circuit's express enumeration of only two situations in which a claim for promissory estoppel may be asserted, i.e., when the Statute of Frauds bars enforcement of a contract, and to enforce a promise in the absence of bargained-for consideration, both of which involve the lack of a valid, enforceable contract, is consistent with the general tenet that a claim for promissory estoppel cannot be asserted when a valid, enforceable contract is found to exist.

[7] Parenthetically, the Court notes that there is debate as to whether courts should recognize claims based upon promissory estoppel as the Court of Appeals has never expressly adopted the doctrine despite its recognition and adoption by the state's lower courts.  *See Farash v. Sykes Datatronics, Inc.*, 59 N.Y.2d 500, 510-11 (1983) (Jasen, J., dissenting) (stating that promissory estoppel was a theory which the Court of Appeals had previously declined to adopt, and which the majority in *Farash* only recognized "*sub silentio*"); *Bunkoff Gen. Contractors, Inc. v. Dunham Elec., Inc.*, 300 A.D.2d 976, 977 (3d Dep't 2002) ("While the Court of Appeals has itself never explicitly applied the doctrine of promissory estoppel . . ., the Court has also never explicitly rejected it as an independent basis for recovery.") (citations omitted); *see also* Arthur B. Schwartz, Note, *The Second Circuit "Estopped": There is No Promissory Estoppel in New York*, 19 Cardozo L. Rev. 1201, 1233-34 (1997) (concluding that the application of promissory estoppel in New York is erroneous without express approval from the New York Court of Appeals).

rule." *A.G. Ship Maint. Corp. v. Lezak*, 69 N.Y.2d 1, 5 (1986) (citations omitted); *see also Coastal Power Int'l, Ltd. v. Transcon. Capital Corp.*, 182 F.3d 163, 165 (2d Cir. 1999) ("[T]he language of the agreement [must] be 'unmistakably clear' regarding whether the parties to the agreement intend provisions of attorneys' fees to apply to disputes among themselves.").

Here, Gentiva argues that because the MSA is silent as to attorneys' fees and disbursements, attorneys' fees and disbursements cannot be awarded. Notably, however, the only mention of attorneys' fees in BVI's opposition papers appears in its attorney's declaration. BVI's counsel argues that he is "personally seeking a reasonable hourly fee, and costs, for having to respond to [Gentiva's frivolous] motion." (Decl. of Manuel Moses, dated Feb. 13, 2012 ("Moses Decl.") at 1-2.) BVI's counsel further states that he requests the fee as "a sanction to be paid to [him] personally." (*Id.* at 2.)

As a preliminary matter, BVI's request for attorneys' fees is ostensibly a motion for Rule 11 sanctions. Rule 11(c)(2) provides, in relevant part, that "[a] motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b)." Accordingly, if BVI seeks sanctions on the basis that Gentiva filed a frivolous motion, it must serve a separation motion for sanctions that complies with Rule 11. *See L.B. Foster Co. v. Am. Piles, Inc.*, 138 F.3d 81, 89 (2d Cir. 1998) ("[I]f sanctions are to be imposed pursuant to Rule 11 upon motion, that motion is to be made separately from any other motion.").

Given that BVI's only response to Gentiva's argument regarding attorneys' fees and disbursements does not address attorneys' fees and disbursements as damages if BVI is the

18

prevailing party, Gentiva's arguments are unopposed.[8]  Since the Court is unaware of any statute or court rule which would permit BVI to recover attorneys' fees and disbursements if it is the prevailing party in its action against Gentiva, BVI's claim seeking attorneys' fees and disbursements is dismissed.[9]

## III.    *Plaintiff's Motion for Summary Judgment is Denied*

BVI asserts four main arguments in support of its motion for summary judgment, namely that: 1) Gentiva breached the MSA by an improper, early termination; 2) Gentiva breached the MSA by discontinuing deductions of premiums from the employees' paychecks; 3) Gentiva breached the MSA by failing to follow the escalation procedures of the MSA; and 4) the commission fee split between Gentiva and its new broker was illegal.  (Pl.'s Mem. in Support at 7-24.)

In opposition, Gentiva argues that BVI's first, third and fourth arguments must fail because they argue in support of claims that were never alleged in BVI's Amended Complaint. (Defs.' Mem. in Opp'n. at 3-8.)  Specifically, Gentiva contends that the Amended Complaint asserts the following counts against Gentiva: 1) breach of contract for Gentiva's "alleged failure

---

[8] BVI filed a "Plaintiff's Reply Memorandum of Law to Defendant's Motion for Summary Judgment" which apparently was intended to be a reply submitted in *support* of BVI's motion for summary judgment rather than a surreply submitted in opposition to Gentiva's motion for summary judgment.  The Court will treat BVI's reply memorandum as a reply in support of its own motion since BVI is not permitted by this Court's Individual Practice Rule 3(D) to file a surreply.  Further, to the extent BVI addresses in its reply Gentiva's argument regarding the propriety of an award of attorneys' fees and disbursements, the Court will not consider BVI's argument as it should have been raised in BVI's memorandum in opposition to Gentiva's motion instead.

[9] The Court notes that Gentiva also argues in support of its motion that BVI's claim for wrongful termination must be dismissed because "no such claim is alleged in plaintiff's Complaint herein."  (Defs.' Mem. in Support at 12-13.)  According to Gentiva, "Plaintiff alleges, in both the Pre-Trial Order it submitted, and in its Motion for Summary Judgment, that the defendant's termination of the contract (MSA) between the parties pursuant to §12 thereof was wrongful and constitutes a breach."  (*Id.* at 12.)  However, because Gentiva's argument is raised in opposition to BVI's motion for summary judgment rather than in support of Gentiva's motion, the Court will address Gentiva's argument, *infra*, when it determines BVI's motion.

to continue payroll deductions for three years following the termination of the [MSA]"; 2)

"[i]mmediate recovery of all commissions due for the 'optional benefits' purchased from

plaintiff by defendants' employees, with interest from the date of contract termination"; and 3)

promissory estoppel and unjust enrichment.  (Defs.' Mem. in Opp'n. at 3.)  Hence, it is Gentiva's

position that the Amended Complaint is devoid of any allegation that: "defendants improperly

terminated the MSA or that the MSA's termination clause could not be exercised before March

31, 2009";  "defendant Gentiva failed to follow the escalation provisions of the MSA";

"defendants split [the new broker's] commission"; or defendants violated New York Insurance

Law and ERISA law by splitting commissions with the new broker.  (Defs.' Mem. in Opp'n. at

4-5.)  The Court agrees.

     BVI's Amended Complaint states claims for relief based upon: 1) Gentiva's "fail[ure] to

maintain the payroll deductions for the three years following the end of the contract as required

by provision number 4 [of the MSA]" (Compl. ¶ 12); 2) the lack of "ambiguity in the

cancellation provision of the contract [requiring] that all commission [sic] would be due

immediately upon cessation of [the] relationship" (*id.*¶ 19); 3) the alleged claim that "Plaintiff

was due commissions for three years on all employees then enrolled, at or around the time of

[sic] notice of termination was first received" (*id.* ¶ 20); 4) "promissory estoppel, wherein the

Defendants are estopped from denying that the plaintiff detrimentally, reasonably, and

foreseeably relied on the promise of defendant" (*id.* ¶ 24); and 5) "quasi-contract, as there was

unjust enrichment on the part of the Defendants" (*id.* ¶ 26).

     Upon a thorough review of the Amended Complaint, which the Court notes is not a

model of clarity, the Court is unable to discern any claim based upon an improper termination of

the MSA other than a claim for damages based upon Gentiva's failure to continue payroll deductions for three years after the termination of the MSA.  Similarly, the Amended Complaint does not contain any claim of a failure by Gentiva to follow the escalation provisions of the MSA, or an improper fee splitting arrangement between Gentiva and its new broker.  Notably, BVI states that its arguments regarding the improper fee splitting arrangement are asserted merely to "point[] out to the Court . . . that the breach of contract in this case is particularly egregious and self motivated, even at the cost of [Gentiva's] own employees."  (Pl.'s Mem. in Support at 23.)  Thus, to the extent BVI seeks summary judgment based upon claims of an improper, early termination of the MSA (for damages other than those resulting from Gentiva's alleged failure to continue payroll deductions for three years after the termination of the MSA), a breach of the agreement and improper termination based upon a failure to follow the escalation provisions of the MSA, an improper fee splitting arrangement between Gentiva and its new broker, violations of New York Insurance Law, and violations of ERISA, those claims will not be addressed by the Court upon this motion as they were not alleged in the Amended Complaint. Should BVI seek to assert new claims, it must file a motion to amend under Rule 15.[10]  *See Cross v. State Farm Ins. Co.*, 926 F. Supp. 2d 436, 450 (N.D.N.Y. 2013) ("It is well settled that

---

[10] BVI relies on the decision of Magistrate Judge Tomlinson, dated September 27, 2010, [Docket No. 71], to support its claim for damages resulting from an improper, early termination of the MSA.  However, the Court notes that Judge Tomlinson's decision, which addressed two motions by BVI seeking leave to amend the Amended Complaint, granted BVI permission to increase the *ad damnum* clause for those "damages stemming from the original breach of contract claim," but did not grant BVI permission to assert a new claim.  Since a careful review of the Amended Complaint reveals that the original breach of contract claim asserted by BVI seeks only those damages relating to Gentiva's alleged failure to continue payroll deductions for three years after the termination of the MSA, BVI cannot assert a new claim upon this motion seeking damages resulting from an improper, early termination of the MSA beyond those damages resulting from Gentiva's failure to continue payroll deductions for three years after the termination of the MSA.

papers on a motion for summary judgment is not the proper vehicle to add a new claim"); *Sasser v. Arkansas Highway & Transp. Dep't*, 2007 WL 4365503, at *1 (E.D. Arkansas Dec. 10, 2007) (rejecting plaintiffs' attempt to add a new claim upon a motion for summary judgment, and directing plaintiffs to instead file a motion to amend under Rule 15).

BVI's only remaining argument in support of its motion is that Gentiva breached the MSA by failing to continue payroll deductions for three years after the termination of the MSA for the commissions owed to BVI. As discussed, *supra*, there are triable issues as to whether: the arrangement between Kleiman and BVI complies with New York Insurance Law; Kleiman, rather than BVI, was the intended recipient of the commissions; and the damages BVI seeks are for commissions rather than unpaid services. Accordingly, there is a triable issue of fact as to whether BVI is entitled to damages in the form of commissions which precludes a finding of summary judgment in its favor.

## CONCLUSION

For the reasons stated above, Gentiva's motion for summary judgment is granted in part and denied in part, and BVI's motion for summary judgment is denied.

**SO ORDERED.**

Dated: Central Islip, New York
January 28, 2014

_____/s/_____
Denis R. Hurley
United States District Judge